STATE of Missouri, Plaintiff–Respondent,

v.

James Berry GREGORY, Defendant–Appellant.

No. 17286.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 21, 1992.

James F. Crews, Crews, Gaw, Lutz & Opie, Tipton, for defendant-appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SHRUM, Presiding Judge.

The defendant James Berry Gregory was found guilty by a jury of sodomy, § 566.-060.1, RSMo 1986,[1] and sentenced in accordance with the jury's recommendation to seven years' imprisonment. He appeals from that judgment.

## ISSUE

The dispositive inquiry is whether the trial court prejudicially erred when it allowed the state, over objection, to question its rebuttal witness Betty Warnock about her extensive criminal record. We answer that question in the affirmative and reverse and remand for further proceedings.

## FACTS

For its case-in-chief, the state called two witnesses, the victim and a deputy sheriff. The testimony of Annie, the 16–year–old victim, is summarized as follows.

On January 2, 1989, Annie went to the home of George and Betty Warnock to help clean up their home which had been damaged by fire. Annie was a friend of Betty Warnock's daughters, Dana, age 14, and Donna, age 15. The persons at the Warnock home in the early afternoon were

---

1. Section 566.060.1 provides: "A person commits the crime of sodomy if he has deviate sexual intercourse with another person to whom he is not married, without that person's consent by the use of forcible compulsion."

*Deviate sexual intercourse* is defined in § 566.-010.1(2) as "any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person...."

Annie, Donna Warnock, Donna's boyfriend Terry Weaver, and the 68–year–old defendant.

After Annie arrived, and at a time when Donna Warnock and her boyfriend Terry were upstairs, the defendant "approached" her. He first asked her about her family and then invited her to sit with him on a love seat located next to the stairs. She sat beside the defendant. He began to rub her breasts, he kissed and hugged her, and he let her "feel his strength" from "the amount of power he put into the hug." The defendant told Annie "not to make him hurt" her. She testified that she was "pretty quiet after that."

While the defendant and Annie were seated on the love seat, Donna and Terry came downstairs, got some tea, and went back upstairs. After going back upstairs, Donna, in an angry tone, told Annie to get upstairs. At that point, the defendant would not let Annie move from where she was seated. He then "undid" her blue jeans, placed his hand on her vagina for "a couple of minutes," and told her he wanted to "f___" her. Annie testified she was "scared." Donna called for her again, and Annie, without further restraint from the defendant, went upstairs.

Later that evening, Annie told Terry Weaver about the incident. The following day she separately informed Donna and Betty Warnock. Annie described Betty Warnock's reaction as one of anger, and she said Betty repeatedly apologized about the incident. Shortly after hearing of the incident, Betty Warnock confronted the defendant in "his room." Also present at this confrontation were Annie and Terry Weaver. When confronted, the defendant was packing to leave the Warnock home. Neither the state nor the defendant's counsel asked Annie about the defendant's response, if any, when he was confronted with the accusation.

Annie did not immediately report the incident to law enforcement officials because she "just wanted to forget about it." After Hickory County officials learned about the incident from another source, they contacted Annie who then told them "exactly what had happened." The defendant was charged on May 17, 1990.

Regarding the relationship between Betty Warnock and the defendant, Annie testified, without objection, that "they were together," "[t]hey had kind of like a flea market," "they were lovers," and he lived in the Warnock house "at that time."

Deputy Sheriff Rodney Kennedy testified he was present when the defendant was arraigned. In the complaint the victim was named "Janie Doe" and Kennedy testified that the defendant asked at arraignment who "Janie Doe" was. Kennedy also testified that after the judge explained that it was "just a name to fill the charge," the defendant asked, "Which one complained?"

At trial, the defendant testified that he had never before been charged with a crime and had no convictions. He acknowledged sitting with Annie on the love seat and that he had put his arm around her. He denied holding her against her will, threatening her, or touching her in any manner other than putting his arm around her. The defendant admitted that Annie, Betty Warnock, and Terry Weaver had met with him in his bedroom at the Warnock home concerning Annie's accusations.

The defendant's testimony about his relationship with Betty Warnock contradicted Annie's. He testified that he and the Warnocks were "just friends." He said he had a bedroom in the Warnock home but lived there only part-time and he "[came] and went when [he] pleased ever [sic] two or three days."

The defendant called three witnesses who testified without objection about the defendant's reputation for truthfulness and honesty. Donnie Platter testified that all she had "ever heard is good." Nina Wayland testified, "Everybody I've talked to says he's honest and well liked." Finally, Mack Cullen testified that the defendant's reputation is "The best there are around Camdenton, anywhere, Camdenton, Linn Creek. There's nothing against that man nowhere in the world." Cullen added he had never heard the defendant use "foul language."

After the defense rested, the state called Betty Warnock as a rebuttal witness. She testified that the defendant stayed at her residence "whenever he wanted to" but denied having any romantic relationship with him. She did not remember the meeting in the defendant's bedroom concerning Annie's accusations. Over the defendant's objection, the state elicited from her that her criminal record included (a) six counts of felony wanton neglect of a minor, December 1982, Polk County, Iowa; (b) abandonment of a dependent person, a felony, December 1982, Polk County, Iowa; (c) solicitation for prostitution when she was "a ... young girl"; (d) solicitation for prostitution in 1973; and (e) violation of federal income tax law, a felony, 1976.

## DISCUSSION AND DECISION

The defendant raises several points on appeal, the first of which is dispositive. In Point I, the defendant claims that the trial court erred when it permitted the state to question Betty Warnock about her criminal convictions. He argues that evidence of Betty's convictions did not rebut his evidence and that the state's purpose in calling Betty Warnock to testify was "to impeach her, and by implication, the Defendant."

In his argument, the defendant relies, in part, on the rule that where the character evidence offered by a defendant is confined to his credibility such testimony may not be impeached by showing that his general reputation for morality is bad or by showing specific acts of immorality; such an attack must be addressed directly to the reputation of the defendant for truth and veracity. *See State v. Kain*, 330 S.W.2d 842, 845 (Mo.1960); *State v. Ivy*, 710 S.W.2d 431, 433 (Mo.App.1986); *State v. Schupp*, 677 S.W.2d 909, 913 (Mo.App. 1984); *State v. Williams*, 513 S.W.2d 718, 721 (Mo.App.1974); *State v. Rand*, 496 S.W.2d 30, 33 (Mo.App.1973). Except for the character trait of truthfulness and veracity, a defendant does not put his character into evidence by simply testifying. II Mo. Criminal Practice, § 23.24 (Mo.Bar 1984). "Unless a defendant's evidence goes to his reputation for some character trait other than truthfulness, any impeachment of his character must be confined to the issue of his credibility." *Id. See State v. Hayes*, 356 Mo. 1033, 204 S.W.2d 723, 725 (1947); *State v. Ferguson*, 353 Mo. 46, 182 S.W.2d 38, 41–42 (1944); *State v. Bugg*, 316 Mo. 581, 292 S.W. 49 (1927). Where the real and ultimate object of the inquiry is the reputation of the defendant for truth and veracity, the impeaching testimony should be confined to that inquiry, i.e., an inquiry as to the defendant's reputation for truth and veracity. *State v. Williams*, 337 Mo. 884, 87 S.W.2d 175, 183 (banc 1935), 100 A.L.R. 1503 (1935).

In response, the state adopts the prosecutor's suggestions in opposition to the defendant's new trial motion. Portions of that argument follow, with emphasis added:

> The Defendant ... placed in issue ... [his] good character.... In placing [his] character in issue the Defendant opened the door to the State calling as a rebuttal witness Ms. Betty Warnock who was the Defendant's live-in and lover and good friend. *It is true that the undersigned prosecutor impeached this witness the State had called in rebuttal,* but such impeachment was entirely proper since any witness who takes the stand is subject to impeachment on their [sic] credibility. *The State was entitled to show that in associating with a person with the numerous felony convictions and convictions for prostitution the Defendant was not a person of good character.*

The state's argument is partially correct. Once the defendant testified, he was subject to being impeached and contradicted as to any matter referred to in his examination-in-chief, as would be any witness. Section 546.260, RSMo 1986. The defendant placed his character in issue by testifying as he did and by calling character witnesses. Contrary to the defendant's assertions, the character evidence he adduced went beyond his reputation for truthfulness in several respects.

First, the defendant testified that he had never had a "criminal offense filed against [him] before this." By denying other criminal charges, the defendant opened the door to impeachment on more than his reputation for truthfulness and veracity.

Second, the defendant's character witnesses were asked about his reputation for "truthfulness and honesty." In the context of character evidence, "honesty" and "truthfulness" are not necessarily the same character traits. *See, e.g., Williams*, 87 S.W.2d at 182 (a person may bear a bad reputation for honesty although he is not considered untruthful, such as where he fails to pay his debts or is a sharp trader); *State v. Foster*, 665 S.W.2d 348, 354 (Mo. App.1984). Honesty encompasses truthfulness but it has a more comprehensive meaning. *State v. Wells*, 586 S.W.2d 354, 359 (Mo.App.1979). A synonym of "honest" is "uprightness," and the quality of being "upright" is one marked by strong moral rectitude. *Id.* Thus, by asking character witnesses about his reputation for "honesty," the defendant expanded the inquiry beyond his reputation for truthfulness.

Third, the three character witnesses did not confine their response to the defendant's reputation for truthfulness and honesty. Specifically, when Donnie Platter was asked about the nature of her acquaintance with the defendant, she replied, "Well, I haven't found nothing but he's just honest and good. He does all my yard work and carpenter work." And Nina Wayland testified as follows:

> Q. (to Mrs. Wayland) Now have you ever heard Jim Gregory's reputation for truthfulness and honesty discussed?
>
> A. Everybody I've talked to says he's honest and well liked.
>
> Q. Has he ever cursed around you?

A. No.

Finally, Mack Cullen testified:

> Q. (to Mr. Cullen) Have you ever heard his reputation discussed for honesty and truthfulness?
>
> A. Yes.
>
> Q. And can you tell this jury what his reputation is?
>
> A. The best there are around Camdenton, anywhere, Camdenton, Linn Creek. There's nothing against that man nowhere in the world.

In summary, the defendant offered evidence of his reputation for truthfulness plus evidence (a) that he had a reputation for honesty, (b) that he had never been charged with other crimes, (c) that in Donnie Platter's personal opinion the defendant was "honest and good," (d) that he had a reputation for being well liked, (e) that he never cursed around Nina Wayland or used foul language around Mack Cullen, and (f) that "There's nothing against that man nowhere in the world."

After the defendant presented his case, including his character evidence, the state was entitled to offer rebuttal testimony only. Rule 27.02; § 546.070, RSMo (1986).[2] Rebuttal testimony is any competent testimony that tends to explain, counteract, repel, refute, or disprove evidence offered by the defense. *State v. Williams*, 442 S.W.2d 61, 65 (Mo.banc 1969); *State v. Reese*, 787 S.W.2d 768, 771 (Mo.App.1990); *State v. Ramsey*, 710 S.W.2d 459, 461 (Mo. App.1986). The state's single rebuttal witness was Betty Warnock. The only testimony elicited from Betty that arguably rebutted any of the defendant's evidence related to her criminal record. The obvious inference which the state wanted the jury to draw was that Betty's convictions plus the defendant's association with her reflects adversely upon the defendant's character and thereby tends to rebut his evidence of good character.

We are cited to no Missouri cases which support or reject the state's position, i.e.,

---

**2.** The rule and statute state an exception. The trial court may permit the parties to offer evidence upon their original cases "for good cause shown or believing that the interests of justice will be served thereby" (Rule 27.02(k)) or "for good reason in furtherance of justice" (§ 546.-070(3)).

that the state can rebut evidence adduced by a defendant about his good character by asking the defendant's consort about her lengthy criminal record. Decisions on this issue in other jurisdictions conflict.[3] However, it is not necessary that we decide the issue because implicit in the state's position is the necessity that there be evidence from which the jury could infer that the defendant associated with Betty Warnock with knowledge of her convictions. If the defendant consorted with Betty without knowing her criminal history, then evidence of her record is not probative of the defendant's character; it does not tend to rebut his good character evidence.

Evidence of the defendant's knowledge of Betty's convictions is totally absent from the record. No inquiry was made of the defendant, either upon direct or cross-examination, about his knowledge of Betty's criminal record. Betty Warnock was not asked if the defendant had knowledge of her criminal record. Betty and the defendant first met in 1984 or 1985, more than two years after Betty's most recent convictions in 1982. Her last convictions occurred out of state, in Polk County, Iowa. Thus, no inference can be drawn that he had knowledge of her convictions simply because of his acquaintance with her. Upon this record, Betty's convictions are not probative to rebut the defendant's good character evidence. The logical relevance of the evidence for such purpose is too remote and strained. *See State v. Earvin*, 510 S.W.2d 419, 422 (Mo.1974). The trial court erred in admitting testimony of Betty's convictions.

■ The state urges that any error in admitting Betty Warnock's testimony was harmless. Harmless error in the admission of evidence does not warrant reversal of a conviction. *State v. Lager*, 744 S.W.2d 453, 457 (Mo.App.1987). But we will declare error in the admission of evidence to be harmless only if we can "declare a belief that it was harmless beyond a reasonable doubt." *State v. Miller*, 650 S.W.2d 619, 621 (Mo.banc 1983), *quoting Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 711 (1967); *Lager*, 744 S.W.2d at 457. To sustain a claim that error in the admission of evidence is harmless, the record must demonstrate "that the defendant was not injured by the error as by showing that the jury disregarded or could not have been influenced by the evidence." *State v. Degraffenreid*, 477 S.W.2d 57, 64 (Mo.banc 1972), *quoting State v. Wynne*, 353 Mo. 276, 182 S.W.2d 294, 300 (1944). *See also State v. Charles*, 572 S.W.2d 193, 199 (Mo.App.1978).

In urging that admission of evidence of Betty Warnock's criminal record was harmless, the state argues that the evidence did not pertain to the defendant's guilt or innocence. Rather, it "only tangentially pertained to the character of [the defendant] in that it pertained to the character of [Betty] Warnock." Citing *State v. Linder*, 613 S.W.2d 918, 928 (Mo.App.1981), the state suggests that the defendant's claim of prejudice should be rejected because the evidence pertained to the acts of a third party. In *Linder*, the defendant, who was charged with promoting prostitution of one under 16 years of age (her 14-year-old daughter), complained that evidence which showed that her daughter was in bed with the girl's stepfather was evidence of a separate and unrelated offense and was so prejudicial that reversal was required. For various reasons, the court rejected defen-

---

**3.** In the majority of jurisdictions it is not competent to show, as a means of impeaching a witness, who and what his associates are. 98 C.J.S. *Witnesses* § 513 (1957). The bad character of third persons with whom a defendant associates is not relevant to prove the defendant's bad character. 1 Wharton's Criminal Evidence § 176 (14th ed. 1985). In *State v. Beaty*, 62 Kan. 266, 62 P. 658 (1900), the defendant offered evidence of his good reputation for honesty; the state in rebuttal offered evidence of the bad reputations of his associates. The court held the rebuttal evidence to have been admit-

ted in error, observing, "Every man is supposed to be able always to support his own general reputation, but ought not to be expected to be ready to defend the character of those with whom he associates." 62 P. at 658. *See also United States v. Hoffa*, 349 F.2d 20 (6th Cir. 1965), *aff'd*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). In certain jurisdictions, subject to trial court discretion, a witness's credibility may be challenged by showing his association with disreputable characters. 81 Am. Jur.2d *Witnesses* § 535 (1976).

dant's claim that admission of the evidence was reversible error, including the fact that "the evidence complained of was the act of third parties, not appellant." 613 S.W.2d at 928.

The state's reliance on *Linder* is misplaced. In *Linder,* the inadmissible evidence did not bear upon or reflect upon the defendant's credibility. In contrast, in this case, determination of the defendant's guilt or innocence turned on credibility. Conviction or acquittal depended upon whether the jury believed the victim or the defendant. The prosecutor succinctly made that point in closing argument when he told the jury, "It's her word against his."

It is inconceivable that the jury disregarded or was not influenced by the evidence of Betty Warnock's convictions. Most of her convictions involved sexual misconduct or crimes against minors. Similar in nature—and similarly repulsive—is the charge that the defendant, a 68–year–old man, committed sodomy on a 16–year–old victim. Given the nature of Betty Warnock's crimes and the charge against the defendant, we believe the jury undoubtedly would have tended to infer that the defendant was less credible because of his association with Betty when, in fact, there was no showing that the defendant knew of Betty Warnock's criminal record. "Trials of charges for which there is a human abhorrence should be conducted with scrupulous fairness to avoid adding other prejudices to that which the charge itself produces." *State v. McElroy,* 518 S.W.2d 459, 461 (Mo.App.1975).

Reference to Betty Warnock's convictions in closing argument as part of the effort to discredit the defendant's testimony reinforces our belief that the jury did not disregard the improper evidence and was influenced by it. The prosecutor, in closing argument, specifically linked Betty Warnock's credibility to that of the defendant when he stated:

> Well, I don't need to go through all the convictions again. What's her [Betty Warnock] word worth? It's not worth anything. And neither is a 68–year–old man's who puts his hand down a 16–year–old girl's pants. It's not worth anything either.

Error, which in a close case might call for reversal, may be disregarded when the evidence of guilt is strong. *Degraffenreid,* 477 S.W.2d at 65. "The corollary of that rule is that, where evidence of guilt is weak, error in the admission of prejudicial evidence may not be simply brushed aside." *State v. Reyes,* 740 S.W.2d 257, 263 (Mo. App.1987). Without characterizing the evidence of guilt in this case as weak, strong, or close, we cannot ignore the fact that the jury's determination of the defendant's guilt or innocence necessarily turned on a decision about who was credible. The jury could not have been left uninfluenced by evidence of Betty Warnock's criminal record. Based upon this record, we conclude that the admission of the evidence of Betty's convictions was both erroneous and prejudicial.

Because the defendant's first allegation of error requires reversal, we need not consider his remaining assignments of error, only some of which were preserved for appellate review.

We reverse and remand for further proceedings.

FLANIGAN, C.J., and MAUS, J., concur.

