STATE of Missouri, Plaintiff–Respondent,

v.

Robert S. ALEXANDER, Defendant–Appellant.

Robert S. ALEXANDER, Movant–Appellant,

v.

STATE of Missouri, Respondent–Respondent.

Nos. 17863, 18808.

Missouri Court of Appeals, Southern District, Division One.

May 18, 1994.

Ellen H. Flottman, Office of the State Public Defender, Columbia, for defendant-movant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Becky Owenson Kilpatrick, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent-respondent.

PER CURIAM.

Robert S. Alexander (Defendant) was charged with violating § 566.060, RSMo 1986, by sodomizing his six-year-old step-daughter between May 28, 1989, and June 16, 1989. Convicted by a jury, he was sentenced to 15 years' imprisonment pursuant to the verdict. In Case No. 17863 he appeals from the judgment imposing the sentence. Defendant claims that the trial court erred (I) by admitting evidence of his misconduct with his son, (II) by allowing the victim to sit on her great-aunt's lap as the victim testified, (III) by admitting pictures of naked women, and (IV) by giving the pattern reasonable doubt

instruction. Point III is dispositive. We reverse and remand.

After sentencing, Defendant sought post-conviction relief under Rule 29.15. In Case No. 18808 he appeals the denial of that motion. Pursuant to Rule 29.15(*l*) the appeals were consolidated. Our disposition of the direct appeal renders moot the issue raised in Case No. 18808. Appeal No. 18808 is therefore dismissed.

### CASE NO. 17863—DIRECT APPEAL

L_M_H_, the victim, was age 8 at the time of trial.[1] The victim's mother, S_A_, died in June 1989. Before the mother's final hospitalization, she and her husband (Defendant), their son B_A_, their daughter H_A_, and the victim lived together. When S_A_ was hospitalized, Defendant was in Illinois. The children's grandmother, D_H_, was at the hospital with her daughter. For those reasons, R_L_, the children's great-aunt, temporarily had the children at her home.

Because R_L_ had been concerned for over a year about possible misconduct of Defendant toward the victim, she took this opportunity to ask the victim "if she still took showers with her dad." At first, the victim did not "want to talk about herself." However, R_L_ pressed the issue and the victim finally made statements suggesting that she had been sodomized anally by Defendant. When the children's grandmother, D_H_, came from the hospital, R_L_ told her what the victim had said.

D_H_, the grandmother, testified that after June 12, 1989, she had custody of all the children, including the victim. Upon questioning by D_H_, the victim related facts suggesting that she had been sodomized by Defendant. D_H_ then contacted juvenile authorities. In addition, D_H_ took the child to three doctors, including an emergency room doctor at Phelps County Regional Medical Center.

Employees from both the Division of Family Services and the Phelps County Sheriff's Office interviewed the victim and her half-brother, B_. At trial they testified that during their interview of the victim she related

facts and used dolls to suggest that Defendant had sodomized her anally.

L_M_H_, the victim, testified at trial that Defendant stuck his "ding-a-ling" in her "privates." When asked to use the anatomically correct dolls to show what Defendant had done, she responded by placing the penis of the male doll both in front of and to the back of the female doll.

Dr. James Taylor, emergency room physician who saw the victim in June 1989, was called for the defense. He testified he did a general physical examination of L_M_H_, with special attention to the genitalia. He found the child's hymenal tissue in place, normal for her age, and for the most part intact without evidence of scar tissue. No abnormalities were found upon anal examination. The only abrasions noted were on her right knee and left ankle. He recorded on the hospital record, "[r]ectal and vaginal, without evidence [of] trauma."

Defendant testified. He denied sodomizing the child. During cross-examination he insisted that D_H_, the grandmother, had "fed [the victim] this story" because she did not want Defendant to take the children back to Illinois.

The jury convicted Defendant of sodomy, and this appeal followed.

In Point III Defendant charges the trial court abused its discretion when it admitted into evidence playing cards that featured naked women, claiming that any probative value to this evidence was outweighed by its prejudicial impact on the jury. He also argues that the cards were not relevant to any issue in the case, and that no valid reason existed for admitting the cards. Defendant insists that the only purpose of the cards was to inflame the jury, i.e., by using the pictures to portray Defendant as a person obsessed with sex.

The cards were ordinary in appearance except that (a) they were larger than the usual deck of cards, and (b) on one side they show adult women with their breasts and buttocks exposed—no men or children were shown on the cards. They depict women in

1. The case was tried July 9, 1991.

poses similar to those frequently seen in the past on service station and garage calendars. The trial judge characterized the pictures as "semi-pornographic." Where, when, or how the state came into possession of the cards does not appear in the record.

Defense counsel filed a motion in limine, seeking an order precluding the state from referring to the cards any time during the trial. In the motion Defendant alleged that such evidence did not tend to prove the guilt of Defendant and would tend to "inflame the passions and prejudices of the jury against defendant."

When the "card" motion was first argued to the trial court, the prosecutor represented to the trial court that the evidence would show "this was a deck of playing cards which the Defendant kept under [the victim's] bed." When asked by the judge, "What exactly is the evidence going to be with regard to these playing cards?," the prosecutor answered, "[The victim] knew that they were there and that she took them to her school ... maintaining they were Daddy's playing cards. This shows the state of mind of this Defendant and what he thought [the victim's] bedroom was for, which is where these acts are alleged to have occurred." The trial court then observed:

"[T]hey may be relevant ... if the man is keeping these ... playing cards under his little girl's bed ... that's a little different than just his having a pack of semi-pornographic playing cards in his possession somewhere.... Depending on what use these playing cards were made and how they fit into this case ... is going to depend on whether they're admissible.... [I]f he's got them in a little girl's room, keeps under the little girl's bed ... I think that they're going to come out."

During pretrial on the day of trial the trial judge reaffirmed his view on the issue, saying:

"[T]he Court has basically overruled the motion for limine [as to the playing cards] ... but would need to hear the evidence in this case ... as the State has indicated to the Court that ... [the victim] will testify that her father kept that deck of cards under her bed.... [I]f that's the way [the

testimony] come in would be relevant.... But it will ... depend upon how the evidence in the case comes in."

Thereafter, during trial and over Defendant's objection, the victim testified regarding the playing cards as follows:

"Q. (to victim, after showing her exhibit 1, the cards). Have you ever seen those cards before?

A. Yes.

Q. And where have you seen them before?

A. They were under my bed.

Q. And who put them under your bed? Do you know?

A. No.

Q. Did anyone ever come in and get them when they were under your bed?

A. I don't think so.

Q. Do they belong to you?

A. No.

Q. Did you happen to take them to school one day?

A. Yes.

Q. And why did you take them to school? Do you remember?

A. No.

Q. Did you ever find out who the cards belonged to?

. . . .

A. No.

Q. Did Bob Alexander ever look at the cards ... when you were around?

A. I don't think so.

Q. Did you ever look at the cards when they were under your bed?

A. No.

Q. Did anyone ever look at the cards when they were under your bed?

A. I think someone did?

Q. Do you remember who it was?

A. No."

When the prosecutor concluded his direct examination of the victim he offered exhibit 1. His offer was denied, with the trial judge saying, "[n]ot sufficient foundation involved." At defense counsel's request the jury was instructed to disregard exhibit 1.

After Defendant testified on direct, the prosecutor opened his cross-examination by asking if exhibit 1, the playing cards, belonged to Defendant. Defense counsel's objection to the question was overruled. Defendant answered, "They were mine and my wife's." The prosecutor then asked, "[Y]ou kept them under [the victim's] bed?" Defendant answered, "[N]o, sir." When he concluded his cross-examination of Defendant, the prosecutor again moved the admission of the playing cards. Defense counsel's objection was overruled and the cards were admitted into evidence.

Upon redirect, Defendant testified that exhibit 1, the cards, were kept in the top drawer of a dresser in the closet of his and his wife's bedroom, that the cards were given to them as a wedding present. Continuing he testified that he never gave the cards to the victim and never placed them under her bed. At the conclusion of the evidentiary phase of the trial, the cards were passed to the jury.

■ The test for relevancy is whether an offered fact logically tends to prove or disprove a fact in issue or corroborates other relevant evidence. *State v. Olson*, 854 S.W.2d 14, 16 (Mo.App.1993); *State v. Hernandez*, 815 S.W.2d 67, 70 (Mo.App.1991) (citing *State v. Moore*, 435 S.W.2d 8, 11[2] (Mo. banc 1968)). The elements of the offense of sodomy required to be proven were: (a) that Defendant committed "deviate sexual intercourse" with the victim, § 566.060.1, RSMo 1986, and (b) the victim was less than fourteen years old. § 566.060.3, RSMo 1986. Deviate sexual intercourse is "any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person." § 566.010.1(2). The issue thus presented by Point III is whether the playing cards logically tended to support or establish any one or more of those elements.

■ The state argues that the playing cards were "relevant to corroborate the testimony of the victim and to throw light on the controversy at issue." Continuing, the state says that because Defendant offered no explanation about how the victim knew about the cards or how she got access to them, "[t]he jury could reasonably have believed that [Defendant] used the cards during his course of conduct with [the victim]." The state relies heavily upon *State v. Nolan*, 717 S.W.2d 573, 577 (Mo.App.1986), to support its argument. Such reliance is misplaced.

In *Nolan* a trial court received into evidence a book containing 176 pages that included sexually explicit photographs of nude children. The book discussed human sex organs, their sexual functions and characteristics, and masturbation. It pictured fondling between a young boy and young girl, both naked. The defendant testified that the book was presented to the girls as an instructional aid. The defendant was convicted of first degree sexual assault of an eleven-year-old female. This court rejected the defendant's claim that the book was irrelevant and its admission prejudicial, saying:

"[The defendant] showed the victim and one of her older sisters the book. It is reasonable to infer that the defendant, exhibiting the book several times, was aroused by the book itself and the girls.... The book was relevant to show the relationship of the parties involved....

"The jury could reasonably believe that he showed the victim the book to try to persuade her that sexual contacts gave pleasure and were not wrong and thereby make her more receptive.... It was part of defendant's pattern of conduct....

"The jury could reasonably find that defendant's display of the book to young girls of very short acquaintance and outside his family was inappropriate conduct showing his preoccupation with sex, making it reasonable to believe that he took advantage of the victim."

*Id.* at 577.

In contrast to *Nolan*, there is no evidence in this record that shows directly or from which it can reasonably be inferred that Defendant (1) showed the cards to the victim, either at the time of his alleged misconduct or on other occasions, or (2) put the playing cards under the victim's bed. The victim testified only to the fact that she had seen the cards under her bed at some unspecified time. She did not know who put them there, did not know whom the cards belonged to, and could not say that Defendant had shown

her the cards. Evidence that Defendant and his wife owned the cards and that the cards were under the victim's bed at some time that is undisclosed by the record, without more, does not tend to show the relationship of the parties involved, a pattern of conduct by Defendant, or a preoccupation by Defendant with sex to reasonably imply that he took advantage of the victim. *Cf. Nolan*, 717 S.W.2d at 577.

Contrary to the state's argument, the cards do not link Defendant to the crime by corroborating the victim's testimony. Proof that the cards were in the house, albeit under the victim's bed at an unknown time, does not by itself logically tend to show that Defendant had deviate sexual intercourse with the victim. Neither does such evidence legitimately tend to prove a material fact in the case by corroborating the testimony of the victim as to the sodomy. The cards were therefore irrelevant and clearly inadmissible; they lacked any probative value concerning a material issue in the case. *See Olson*, 854 S.W.2d at 16 (defendant charged with sodomizing his stepdaughter; victim's testimony that defendant provided beer and a magazine with pictures of naked women to victim's six-year-old brother, held not relevant); *Hernandez*, 815 S.W.2d at 71 (drinking slogans in defendant's motor vehicle not relevant to issue of whether defendant acted with criminal negligence).

■ The remaining question is whether the admission of the playing cards into evidence was prejudicial. Harmless error in the admission of evidence does not warrant reversal of a conviction. *State v. Lager*, 744 S.W.2d 453, 457[5] (Mo.App.1987). But we will declare error in the admission of evidence to be harmless only if we can " 'declare a belief that it was harmless beyond a reasonable doubt.' " *State v. Miller*, 650 S.W.2d 619, 621[2] (Mo. banc 1983) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 711 (1967)); *Lager*, 744 S.W.2d at 457[5]. To sustain a claim that error in the admission of evidence is harmless, the record must show " 'that the defendant was not injured by the error as by showing that the jury disregarded or could not have been influenced by the evidence.' "

*State v. Degraffenreid*, 477 S.W.2d 57, 64 (Mo. banc 1972) (quoting *State v. Wynne*, 353 Mo. 276, 182 S.W.2d 294, 300 (1944)). *See also State v. Gregory*, 822 S.W.2d 946, 951[6] (Mo.App.1992).

■ The content of the playing cards was such that in different circumstances or in another type case a reasonable jury would disregard them and would not be influenced by their presence. We believe otherwise in this case. The inference that the prosecutor intended the jury to draw, and which it likely did draw, is that Defendant used the cards in some fashion in carrying out deviate sexual intercourse with the victim. Indeed, the state concedes as much when, in its relevancy argument, it insists that "[t]he jury could reasonably have believed [Defendant] used the cards during his course of conduct." Clearly, the state believed that the jury would be influenced by the cards, not because of their content, but because of the inference that Defendant used the cards in some fashion in sodomizing the victim. Under the circumstances it is inconceivable that the jury would disregard or was not influenced by the playing cards. "Trials of charges for which there is a human abhorrence should be conducted with scrupulous fairness to avoid adding other prejudices to that which the charge itself produces." *State v. McElroy*, 518 S.W.2d 459, 461[6] (Mo.App. 1975).

We conclude that the admission of the cards was both erroneous and prejudicial. *See Olson*, 854 S.W.2d at 16.

In Point I Defendant contends that the trial court "erred and plainly erred" by admitting evidence that Defendant committed uncharged crimes, specifically uncharged sex crimes against his son, B_A_. The admissibility of the uncharged crimes testimony will arise again at retrial. Thus, we address the issue now.

At trial the prosecutor asked the first witness, R_L_, the great-aunt, "Did [the victim] tell you about anything she had witnessed between the Defendant and B_ [the victim's little brother]?" Defense counsel objected. The trial court responded, "Overruled as to that." The prosecutor then asked R_L_,

"What did [the victim] tell you that she had seen?" No further objection was made by defense counsel. R_L_ answered, "She had seen [Defendant] peeing in B_'s mouth and B_ peeing in [Defendant's] mouth. They would take showers together."

When the victim testified, she was asked about her observations of Defendant's abuse of his son, B_A_. Over objection the victim testified that she had seen her little brother "peeing in [Defendant's] mouth."

■ Defendant relies on the general rule that evidence of uncharged crimes, wrongs, or acts is not admissible to show a defendant has a propensity to commit crimes such as the crime charged. *State v. Conley,* 873 S.W.2d 233, 236 (Mo. banc 1994), (citing *State v. Bernard,* 849 S.W.2d 10, 13[1] (Mo. banc 1993)). He acknowledges that several exceptions to the general rule do exist and that "[e]vidence of uncharged misconduct may be admissible to show motive, intent, identity, absence of mistake or accident, or a common scheme or plan." *Conley,* 873 S.W.2d at 236. Defendant insists however that none of the exceptions apply in this case. We agree.

■ Neither motive, intent, identity, nor absence of mistake or accident were issues in this case. Until the state has some reason to believe that a defendant intends to make either motive, intent, identity, or mistake or accident a legitimate issue in a case, offering evidence in support of those issues is unnecessary. *See Conley,* 873 S.W.2d at 237. *See also State v. Atkinson,* 293 S.W.2d 941, 943 (Mo.1956). Where, as here, evidence of other crimes was unnecessary because motive, intent, identity, or absence of mistake or accident were not issues, the probative value of such evidence is far outweighed by its prejudicial effect. *Conley,* 873 S.W.2d at 237. *See Bernard,* 849 S.W.2d at 13[2].

In its brief (pre-*Conley*) the state argued that evidence of Defendant's conduct toward his son was admissible to show his intent and motive. Because *Conley* clearly rejected that argument, the state did not at oral argument (post-*Conley*) pursue that position. Rather, it insisted that such evidence was admissible to show common scheme or plan. We disagree.

The *Bernard* court observed that Missouri courts had liberalized the "common scheme or plan" exception in sexual abuse cases to the extent that the original purpose of the exception was being distorted. 849 S.W.2d at 13. *Bernard* declined to continue down that path and refused to follow the "depraved sexual instincts" exception. Instead, it recognized a separate exception for " 'signature *modus operandi*/corroboration' evidence." *Id.* at 17 (quoting *State v. Sladek,* 835 S.W.2d 308, 317 (Mo. banc 1992)) (Thomas, J., concurring) (emphasis in *Bernard*). "In the context of corroboration, evidence of prior crimes is logically relevant in that it has a legitimate tendency to prove a material fact in the case by corroborating the testimony of the victim as to the sexual assault." *Id.* at 17[8]. "Evidence of prior sexual misconduct that corroborates the testimony of the victim should be nearly identical to the charged crime and so unusual and distinctive as to be a signature of the defendant's *modus operandi.*" *Id.* at 17[9].

"What *Bernard* attempted to make clear was that where the uncharged offenses or conduct involved different victims at a different and unrelated time and place, the traditional common scheme or plan exception would not apply. However, the Court in *Bernard* went on to recognize a related exception known as the 'signature *modus operandi*/corroboration exception.' That exception, similar to the identity exception, authorized evidence of an uncharged crime if the offenses are nearly identical and their methodology so unusual and distinctive that they amount to a signature of the defendant involved in both crimes."
*Conley,* 873 S.W.2d at 236.

We find nothing so distinctive or unusual about Defendant's uncharged conduct as to cause it to fall within the signature *modus operandi* exception as outlined in *Bernard* and *Conley. See State v. Troupe,* 863 S.W.2d 633, 636 (Mo.App.1993). Defendant's alleged misconduct with his son does not fall within the "common scheme or plan" exception as that exception is explained in *Bernard* and in *Conley.* Thus the probative value of such

evidence was far outweighed by its prejudicial effect and the trial court erred in admitting it. *See Conley,* 873 S.W.2d at 237; *Bernard,* 849 S.W.2d at 17[9].

 Nonetheless, not every error in the admission of evidence, even of other crimes or misconduct, calls for reversal of a conviction. *State v. Henderson,* 826 S.W.2d 371, 374[8] (Mo.App.1992). Only prejudicial error is reversible error. *State v. Teal,* 624 S.W.2d 122, 125[8] (Mo.App.1981). Admitting evidence of misconduct or uncharged crimes does not result in reversible error if like evidence has previously been admitted and the evidence to which objection has been raised is thus merely cumulative. *Id* at 126[9]. *See also State v. Burnside,* 527 S.W.2d 22, 25[5] (Mo.App.1975) (improper testimony of other crime held to be cumulative to other evidence that came in without objection and was therefore harmless). *See also State v. Pruitt,* 756 S.W.2d 201, 203 (Mo.App.1988) ("Admission of evidence of unrelated crimes which is merely cumulative of other evidence received without objection, if error, is harmless").

 Standing alone, the trial court's evidentiary ruling allowing the victim to testify about Defendant's misconduct with his son carried the potential of great prejudice. *See Conley,* 873 S.W.2d at 236; *Bernard,* 849 S.W.2d at 20. However, we cannot say that the jury convicted Defendant because of the trial court's erroneous ruling because similar evidence of Defendant's misconduct had already been provided by the testimony of R_L_, the great-aunt. She had testified earlier, without objection, that the victim had told her about the Defendant and his son "peeing" in each other's mouth. We are not convinced that the victim's testimony about the same misconduct was the piece of evidence that determined the outcome of the case. Given the circumstances of the presentation of evidence at trial, the trial court's error in admitting the victim's testimony about Defendant's misconduct was harmless. *See Burnside,* 527 S.W.2d at 25. It is for that reason that, if required to rule Point I, we would deny it.

In Point IV Defendant complains of the jury instruction that defined "proof beyond a reasonable doubt." If required to rule Point IV, we would deny it. *State v. Harris,* 870 S.W.2d 798, 811[28] (Mo. banc 1994).

In Point II Defendant charges that the trial court erred when it allowed the victim to sit on her great-aunt's lap as the victim testified. Defendant insists he was prejudiced by such procedure because it served to improperly bolster the victim's testimony and left open the possibility of the great-aunt's communicating nonverbally with the victim. Since the victim will be over eleven years of age upon retrial, we cannot conceive that such a procedure would be an issue upon retrial. We therefore decline to reach that issue.

Judgment reversed and remanded in No. 17863; appeal in No. 18808 dismissed.