STATE of Missouri, Respondent,

v.

Christopher W. GILYARD, Appellant.

No. 80269.

Supreme Court of Missouri,
En Banc.

Oct. 20, 1998.

Emmett D. Queener, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel W. Follett, Asst. Atty. Gen., Jefferson City, for Respondent.

HOLSTEIN, Judge.

Christopher Gilyard was convicted by a jury of forcible rape and false imprisonment. The circuit court found that Gilyard was a predatory sexual offender. *Sec. 558.018.5(2), RSMo Supp.1996.* Gilyard was sentenced to one year for the false imprisonment conviction and to life imprisonment for the rape conviction with eligibility for parole after serving fifteen years.

Gilyard appeals, claiming that sec. 558.018 is unconstitutional and that the trial court improperly admitted evidence of a prior uncharged sexual assault. Because he challenges the constitutional validity of a statute,

this Court has jurisdiction. *Mo. Const. art. V, sec. 3*. The judgment is affirmed.

## I.

J.D., a sixteen-year old female, and a relative were walking near 38th and Indiana Streets in Kansas City, Missouri, when Gilyard drove up and tried to talk with J.D. She resisted talking with Gilyard and told him that he was too old for her. Gilyard then drove off and left them alone. A couple of months later, on October 26, 1996, J.D. was walking home from her sister's apartment when Gilyard again pulled up next to her in a car. This time Gilyard asked J.D. to get into the car with him. J.D. refused a ride and kept walking. Gilyard followed along in his car until J.D. stopped at a bus stop near 39th and Elmwood Streets. At the bus stop, Gilyard got out of the car, grabbed J.D. by the arm and said that he was taking her home. J.D. struggled to get away, and Gilyard dragged her to the car and pushed her into the passenger side of the vehicle. Once in the car, J.D. asked to be taken to her home, but Gilyard said that he was taking her to his house. In an attempt to get Gilyard to take her to her home, J.D. told Gilyard that her mother was waiting to take her to a hair appointment. When Gilyard still refused to let J.D. go, she tried to jump from the car. Gilyard grabbed her arm tightly and held her until they reached his house in the 3500 block of Elmwood. Still holding on to J.D.'s arm, Gilyard forced her up the stairs to his house.

Once inside, Gilyard told J.D. that they were going to have sex. He pushed her into a bedroom. J.D. continuously told Gilyard "no" and struggled to free herself from his grasp. Gilyard pushed J.D. onto the bed and told her again that they were going to have sex. When J.D. again refused, Gilyard said, "I'm going to bite you until you say yes." J.D. still refused, so Gilyard lay on top of her and bit her on her cheek. Gilyard asked J.D. if she would say "yes" now, but she continued to refuse. Gilyard bit her again and through his clenched teeth said, "I'm not going to stop biting until you say yes." Gilyard continued to bite J.D. until she "couldn't take the pain" and agreed to give in to Gilyard's demand.

Gilyard then led J.D. into the front room where he ordered her to take off one shoe, one pants leg and her underwear. J.D. again refused Gilyard's advances. He bit her several more times. He then forced her legs open with his hands. Gilyard next ordered J.D. to remain on the floor or he would beat her. Gilyard then took off his pants and underwear, put on a condom and began having intercourse with J.D.

When Gilyard had finished, J.D. asked to put her clothes back on but Gilyard said "no," telling her that he would beat her if she got up. When Gilyard went to the bathroom, J.D. put her clothes on and tried to leave. However, Gilyard saw her and grabbed her and shoved her into the wall, telling her again that he was going to beat her. After he had shoved her into the wall, Gilyard put his clothes back on and eventually led J.D. outside through the front door. Holding her arm tightly, Gilyard forced J.D. back into his car and drove away from the house.

When Gilyard slowed the car to make a turn, J.D. tried to escape again. Gilyard then pushed J.D.'s head into his lap, causing her to start screaming. Gilyard pushed his elbow into the back of J.D.'s neck, telling her that if she did not stop screaming, he would break her neck. Gilyard managed to shut the door and backed the car into a nearby parking lot. A neighbor was sitting in her yard across the street from the parking lot and heard J.D. screaming and saw her trying to get out of the car. The neighbor immediately called the police.

Gilyard let J.D. sit up and told her that they needed to talk. J.D. slipped a piece of paper from her pocket and tried to write down the address of the house where the attack had taken place. Gilyard saw this and tried to take the paper from J.D.'s hand.

As the two were wrestling over the paper, the police arrived at the scene. When J.D. saw the police, she jumped from the car, waving her hands and screaming. J.D. told the police that Gilyard raped her, but Gilyard told the police that "it wasn't rape." The police took Gilyard into custody. Later, police later found a used condom wrapped in

toilet paper in a trash can in Gilyard's bathroom.

## II.

The state filed an amended information charging Gilyard with the forcible rape and kidnapping of J.D. In the same information, the state charged Gilyard with the sodomy and rape of two other women for incidents that also occurred in October of 1996. The state further charged that Gilyard was a prior and persistent offender and a predatory sexual offender. Gilyard moved to sever the charges into three separate trials, one trial for each victim. The circuit court granted the motion. The state then filed a second amended information charging Gilyard only with the kidnapping and forcible rape of J.D. The state maintained its allegation that Gilyard was a prior and persistent offender and a predatory sexual offender. The state also filed a motion *in limine* to introduce evidence of the offenses it had dropped from its earlier information. Gilyard moved to exclude the evidence. The trial judge ruled the evidence of Gilyard's prior uncharged offenses would be admissible.

At trial, after presenting the above evidence regarding J.D., the state called S.W., a nineteen-year-old female, as a witness. S.W. was one of the victims of the earlier sodomy and rape charges that Gilyard had successfully moved to sever from the J.D. trial and that the state had subsequently dropped. S.W. testified that Gilyard introduced himself to her at a grocery store a few weeks before October 16, 1996. Over Gilyard's objection, S.W. testified that on October 16, 1996, when S.W. was eighteen years old, she voluntarily accompanied Gilyard to his home to watch movies. Gilyard sat next to S.W. on the couch and started kissing her on the neck. S.W. asked Gilyard to stop, and he asked her why she was being like that. Gilyard then lay down on the couch and put his hands inside her pants and his fingers inside of her vagina. Gilyard then asked repeatedly for sex and dug his fingers into S.W. as she refused. S.W. finally relented, took her pants off and lay on the floor. Gilyard also took his pants off, and S.W. saw that he was already wearing a condom. Gilyard raped

S.W. as she lay on the floor. When Gilyard finished, S.W. asked to be taken home, but Gilyard refused. Instead, Gilyard demanded that S.W. perform oral sex on him. When S.W. refused, Gilyard grabbed her and bit her on the face and shoved her head into his lap until she complied.

Gilyard's attorney argued to the jury that J.D. willingly got into his car and went to his house. His attorney conceded that Gilyard and J.D. had intercourse; however, he asserted that J.D. consented and that the bites came in the heat of passion. Defense counsel also admitted that Gilyard and S.W. had intercourse and oral sex but claimed that all acts were consensual.

The jury convicted Gilyard of one count of forcible rape and one count of false imprisonment. Prior to sentencing, the court found beyond a reasonable doubt that Gilyard was a predatory sexual offender within the meaning of sec. 558.018.5(2). The court sentenced Gilyard to one year on the conviction for false imprisonment. Pursuant to sec. 558.018.6, the court sentenced Gilyard to life imprisonment on the conviction for forcible rape. Based on the pre-sentence investigation report, the court determined that Gilyard would be eligible for parole after serving fifteen years of his life sentence.

Gilyard raises two points on appeal. First, Gilyard challenges the constitutionality of the predatory sexual offender act. Second, Gilyard argues that the trial court erred in admitting the testimony of S.W. regarding the prior uncharged sexual assault. The admission of S.W.'s testimony must be addressed first, as this Court will not address constitutional issues when a case can be otherwise resolved. *State ex rel. Director of Revenue v. Gabbert*, 925 S.W.2d 838, 839 (Mo. banc 1996).

## III.

Evidence of prior uncharged misconduct is inadmissible for the sole purpose of showing the propensity of the defendant to commit such acts. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). However, evidence of prior uncharged misconduct is admissible to show motive, intent, absence of mistake or accident, common scheme or plan,

or a signature *modus operandi.* *State v. Roberts,* 948 S.W.2d 577, 591 (Mo. banc 1997). This Court set out the perimeters of the signature *modus operandi,* or corroboration exception, in *Bernard.* To meet the corroboration exception, evidence of prior uncharged crimes, like all admissible evidence, must be logically and legally relevant. *Bernard,* 849 S.W.2d at 17. Corroboration evidence is logically relevant if it has a legitimate tendency to prove a material fact in the case by corroborating the testimony of the victim as to the charged crime. *Id.* Corroboration evidence is legally relevant if the probative value of the evidence outweighs its prejudicial effect. *Id.* Because the prejudice of corroborative evidence is high, the probative value of the offered evidence must meet a high standard. The uncharged offense "should be nearly identical" to the crime for which the defendant is charged. *Id.* Additionally, the evidence of the prior act and the charged crime should be so "unusual and distinctive as to be a signature of the defendant's *modus operandi.*" *Id.* The balancing of the prejudice against the probative value rests within the sound discretion of the trial court. *Id.* at 13.

In a rape case, corroborative evidence can be highly probative of victim credibility and may even be essential, such as where the victim's testimony is unconvincing or contradictory. *See State v. Greenlee,* 943 S.W.2d 316, 318 (Mo.App.1997) (citing *State v. Baldwin,* 571 S.W.2d 236 (Mo. banc 1978)). Unusual and distinctive conduct of the attacker may actually make the victim seem less believable. However, when two or more victims independently report the same distinctive acts during or preliminary to separate sexual assaults by a defendant, the earlier acts are probative of the veracity of the last victim. *Bernard,* 849 S.W.2d at 17. The more unusual and distinctive the act, the higher the probative value of the act in corroborating the last victim's testimony.

▉ In the present case, Gilyard's defense to the charged crime was that the sexual acts were consensual. Therefore, J.D.'s lack of consent and Gilyard's use of force to obtain compliance were both material facts in the case. S.W.'s testimony about the exceptionally similar prior sexual assault had a legitimate tendency to corroborate J.D.'s claim that she also had been the victim of rape by forcible compulsion. Therefore, the trial court did not abuse its discretion in determining that S.W.'s testimony was logically relevant. *See Bernard,* 849 S.W.2d at 17.

Gilyard argues that S.W.'s testimony is not legally relevant in that her testimony was "devastatingly prejudicial" and greatly outweighed its probative value. Applying *Bernard,* S.W.'s testimony is legally relevant if the evidence of Gilyard's assault on S.W. is nearly identical to the evidence of his assault on J.D. and if the evidence is sufficiently unusual and distinctive to serve as Gilyard's signature.

In *Bernard,* the victim claimed that the defendant asked him to take off his clothes and run around the defendant's car or walk around the car in his underwear. *Bernard,* 849 S.W.2d at 19. One witness testified that on a prior occasion, he rode in the car with defendant and saw two other boys stripped and running naked in front of the car. *Id.* Two other witnesses testified that the defendant had previously asked them to run naked in front of a slow moving car. *Id.* A fourth witness testified that the defendant had asked him to sit naked on the hood of the defendant's car while he drove it slowly along. *Id.* The incidents testified to by all four witnesses occurred at least ten years before the charged incident. *Id.* at 12–13. This Court found the defendant's "preference for naked or partially clothed boys in motion on or around an automobile" to be nearly identical in each occurrence. *Id.* at 19. This Court further found the activity to be "so unusual and distinctive as to 'earmark' it as the conduct of the accused and, thus, to corroborate the testimony of the victim in the present case." *Id.*

Because of the stringent standard for legal relevance, however, most cases addressing the corroboration exception have held the evidence of prior uncharged misconduct inadmissible. For example, in *Bernard* this Court found that the defendant's showing nude photographs of young boys to his prior victims and arranging sleepovers with them in order to abuse them, while nearly identical

to the charged crime, were not sufficiently unusual and distinctive to be admissible under the corroboration exception. *Bernard,* 849 S.W.2d at 19. In *Conley,* the defendant was charged with fondling five young boys. *State v. Conley,* 873 S.W.2d 233, 234–35 (Mo. banc 1994). This Court decided that evidence from prior uncharged incidents could not be admitted under the corroboration exception in that case because the common items were not sufficiently distinctive. *Id.* at 236. This Court pointed out that the progression of sexual activity was similar, but the acts of gaining the confidence of the boys, befriending the boys, hugging, kissing and gradually fondling the boys was not sufficiently unusual to be a signature crime. *Id.See also State v. Thomas,* 857 S.W.2d 537, 539 (Mo.App.1993); *State v. Phillips,* 854 S.W.2d 803, 806 (Mo.App.1993); and *State v. Bird,* 854 S.W.2d 807, 809 (Mo.App.1993). Other cases have denied the admission of evidence of prior uncharged offenses because the prior acts were not sufficiently similar to the charged offense. *See State v. Jones,* 914 S.W.2d 852, 856 (Mo.App.1996); *State v. Frey,* 897 S.W.2d 25, 31 (Mo.App.1995); *State v. Sexton,* 890 S.W.2d 389 (Mo.App. 1995); *State v. Alexander,* 875 S.W.2d 924, 930 (Mo.App.1994); and *State v. Vowell,* 863 S.W.2d 954 (Mo.App.1993). In none of these cases did the uncharged and charged acts rise to the high level of distinctive and unusual characteristics that exist here.

In the present case, there are many common aspects between the assault on J.D. and the assault on S.W.: both victims were teenage girls; Gilyard was previously acquainted with each of his victims; both assaults occurred within the same month; both took place in Gilyard's home; Gilyard put on a condom for each assault; and Gilyard bit both girls on the cheek in order to compel them to consent to the sexual acts. But mere similarity of the crimes is not sufficient to meet the *Bernard* standard.

The assaults must be sufficiently distinctive to earmark the assaults as Gilyard's method of operation. Gilyard points out that several rape victims have been bitten on the hand, neck or back incident to an assault. But the victims here were not merely bitten

during a rape. Here the record shows a remarkably consistent pattern of sexual assaults that include demanding sex and enforcing those demands through the unusual and distinctive means of biting the victims on the cheek. While sitting as a trial judge, one might rule differently. But it cannot be said that the trial court's ruling was clearly against reason and, thus, amounted to an abuse of discretion.

### IV.

Gilyard next argues that the predatory sexual offender act violates due process and equal protection. The gravamen of both Gilyard's constitutional claims is that he is being punished for a crime for which he did not receive a jury trial.

Section 558.018.6 states that a person found to be a "predatory sexual offender" must be sentenced to life in prison. A predatory sexual offender is eligible for parole and is not subject to the minimum prison term requirements of sec. 558.019.4. However, a person can be sentenced as a predatory sexual offender even if that person has not had any previous convictions. A court can find an offender to be a predatory sexual offender if that offender has previously committed an act that would constitute a prescribed sexual offense "whether or not the act resulted in a conviction." *Sec. 558.018.5(2).*

In the present case, the trial court found beyond a reasonable doubt that Gilyard was a predatory sexual offender. Because the state did not introduce evidence of any prior convictions of Gilyard, the trial court must have relied on S.W.'s testimony regarding Gilyard's assault on October 16, 1996. Therefore, Gilyard claims that he is being punished for that assault, a crime for which he did not receive or waive the right to a jury trial.

If Gilyard were being punished for the October 16 assault, then he would have a right to a jury trial on that offense. However, Gilyard is not being punished for the October 16 assault; therefore, he does not have a right to a jury trial on that offense. A sentencing judge is not under the same restrictions as a jury that is considering the

issue of guilt. *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

Appropriate sentencing requires the fullest information possible concerning the defendant's life and characteristics. *Id.* Full due process rights are not implicated by the consideration by the sentencing court of these outside factors. *Id.* at 246. Sentencing courts have traditionally "not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior." *Witte v. United States,* 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995).

Sentencing Gilyard under sec. 558.018.4–.6 did not violate his rights to due process and equal protection. The judgment is affirmed.

BENTON, C.J., and PRICE and COVINGTON, JJ., concur.

LIMBAUGH, J., dissents in separate opinion filed.

WHITE and WOLFF, JJ., concur in opinion of LIMBAUGH, J.

LIMBAUGH, Judge, dissenting.

I have no quarrel with the way in which the majority applies *State v. Bernard's* signature modus operandi corroboration exception to justify the admission of evidence of uncharged misconduct under the facts of this case, but I write separately to revisit the propriety of the exception itself. The exception, stripped to its essence, is based on sheer propensity evidence—evidence that the courts have roundly condemned because, as even the *Bernard* majority notes, it "may encourage the jury to convict the defendant because of his propensity to commit such crimes without regard to whether he is actually guilty of the crime charged." *State v. Bernard,* 849 S.W.2d 10, 16 (Mo. banc 1993). Although Judges Robertson and Thomas both wrote separate opinions in *Bernard* in which they forcefully voiced their opposition to the adoption of a signature m. o. corroboration exception, and in which Judge Thomas apologetically decried "having planted the seed for [the] exception ... in *Sladek,*" *id.* at

27 (Thomas, J. concurring), I will attempt to elaborate and expand on their points. My efforts are prompted all the more by this Court's reaffirmation today in *State v. Burns,* 978 S.W.2d 759 (Mo. banc 1998), that the rule barring propensity evidence has a constitutional underpinning.

Both the proponents and the opponents to the exception agree on the basic principles regarding the use of other crimes evidence. As stated in *Bernard,*

The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes.... Evidence of prior misconduct of the defendant, although not admissible to show propensity, is admissible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial, and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect.

849 S.W.2d at 13 (citations omitted). Under these principles, only when evidence of other crimes is logically relevant—that is, the evidence is relevant on some issue other than the defendant's propensity to commit crimes—may the probative value increase to the point that it outweighs the prejudicial effect so that the evidence becomes legally relevant. In those situations, exceptions to the general rule of excluding other crimes evidence are recognized. The most commonly recognized exceptions, of course, are those involving evidence offered to show motive, intent, absence of mistake or accident, common scheme or plan, and identity, although the list is certainly non-exclusive. *Id.*

The *Bernard* majority's adoption of the signature m. o. corroboration exception rests on two premises: 1) that "evidence of prior crimes is logically relevant in that it has a legitimate tendency to prove a material fact in the case by corroborating the testimony of the victim as to the sexual assault," and 2) that the probative value of such logically relevant evidence outweighs the prejudicial effect when it is "nearly identical to the

charged crime and so unusual and distinctive as to be a signature of the defendant's *modus operandi.*" *Id.* at 17. This analysis, in my view, is fundamentally skewed. To be sure, the "signature" aspect of the evidence gives it great probative value that may outweigh the prejudicial effect, but the weighing takes place only if it is first determined that the evidence is logically relevant.

Evidence of prior crimes offered for corroboration is not logically relevant because it corroborates solely by showing defendant's propensity to commit crime. In fact, propensity evidence corroborates the State's proof on every issue in the case, and if corroboration was a proper exception, there would be no rule. Professor Imwinkelried, in his seminal treatise "Uncharged Misconduct Evidence," explained the matter in this way:

> Corroborating evidence is merely evidence that confirms other evidence of a fact.... Any similar uncharged act generally corroborates in the sense that the act shows the defendant's propensity toward that type of crime and thereby increases the likelihood that the defendant committed the charged act. But that is precisely the theory of logical relevance forbidden by Rule 404(b)[the federal prohibition against other crimes evidence]. That "corroborative" use of uncharged misconduct would be a patent violation of Rule 404(b). If "corroboration" were a separate "exception" to the exclusionary rule, that exception would swallow the rule.

Edward J. Imwinkelried, Uncharged Misconduct Evidence, sec. 6:05 (1996).

As I understand the *Bernard* analysis, the ill effects of the corroboration evidence are somehow cured by restricting the admission of that evidence to signature m. o. cases. In my view, however, the signature m. o. version of corroboration evidence is no less pure propensity evidence; it still corroborates solely by showing defendant's propensity. In essence, the signature m. o. characteristic does nothing more than boost the probative value of pure propensity evidence, and further, that evidence, in such a supercharged form, is the most prejudicial propensity evidence of all.

Oddly enough, the *Bernard* majority expressly acknowledged the problem by citing Judge Thomas' concern that,

> [a]lthough we have called this exception corroboration, it really involves reasoning from the signature modus operandi based upon the propensity of the defendant to commit this type of crime to the conclusion that the defendant committed the crime charged. This reasoning goes squarely against the rationale for the general rule.

849 S.W.2d at 17. Having conceded that signature m. o. corroboration evidence is essentially propensity evidence, which by definition is not logically relevant, the majority nonetheless proceeded to weigh the probative value of the so-called logically relevant evidence against the prejudicial effect to arrive at its desired result.

Indeed, it would have been much more understandable had the majority simply abandoned any attempt at the logical relevance/legal relevance analysis, acknowledged that it was dealing with sheer propensity evidence, and adopted the exception on the basis of competing policy considerations. It could be said, for instance, that the great probative value of signature m. o. corroboration evidence simply overrides the interests of the defendant. It is not wholly irrational, in other words, to allow propensity evidence as substantive evidence of guilt in certain cases. That is exactly the conclusion reached by the legislature when it enacted section 566.025, RSMo 1994, which provides that in prosecutions for sexual assaults against children under the age of 14, "evidence that the defendant has committed other charged or uncharged crimes involving victims under fourteen years of age shall be admissible for the purpose of showing the propensity of the defendant to commit the crime or crimes with which he is charged." This approach, of course, is not a viable option as this Court has today ruled that section 566.025 is unconstitutional to the extent that it authorizes the admission of propensity evidence. Alas, I am unable to reconcile the rejection of propensity evidence under *Burns* with the admission of propensity evidence under *Bernard's* signature m. o. exception.

For the foregoing reasons, I would overrule that part of *State v. Bernard* authorizing a signature m. o. corroboration exception. Because admission of the other crimes evidence in the case at hand depends on the validity of the *Bernard* exception, the evidence should have been disallowed. Accordingly, I would reverse the conviction and remand for a new trial.