**STATE of Missouri, Plaintiff–
Respondent,**

v.

**Jeffrey A. WINDER, Defendant–
Appellant.**

No. 23899.

Missouri Court of Appeals,
Southern District,
Division Two.

July 31, 2001.

Rosalynn Koch, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General and Dora A. Fichter, Assistant Attorney General, Jefferson City, for Respondent.

GARRISON, Judge.

Jeffrey A. Winder ("Defendant") was charged, as a prior and persistent offender, with three counts of tampering with a motor vehicle, in violation of Section 569.080.1(2),[1] and four counts of receiving stolen property, in violation of Section 570.080.[2] A jury found Defendant guilty on all seven counts, and he was sentenced to seven concurrent terms of eighteen years imprisonment. Defendant appeals.

As Defendant contests the sufficiency of the evidence supporting his convictions, appellate "review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998). In applying this standard, the Court accepts as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence, and disregards all evidence to the contrary. *Id.* Viewed in this light, the evidence most favorable to the verdicts shows:

Stanley White ("Officer White"), a reserve police officer with the Crane Police Department, lived on County Road M–130 in Stone County and routinely drove by an old house (the "house") that once belonged to his grandfather. The house had been vacant for some time. However, in March or April 1998, Officer White began to notice some activity at the house late at night and observed an increased volume of traffic around the house with nice vehicles parked there for a day or two. Officer White contacted the Stone County Sheriff's Department and was advised to put the house under surveillance. Between mid-May and July 13, 1998, he was able to monitor the house from a community building across the street. On numerous occasions, he saw cars and trucks parked behind the house in an open field. The vehicles would come and go, but a green pickup truck and a station wagon were always there.

A three-car garage was adjacent to the house. The lights in the garage were al-

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

2. Defendant was also charged with one count of possession of a controlled substance, in violation of Section 195.202. The trial court severed that charge prior to trial.

ways on, and people were present in the garage with the doors closed, despite the fact that the garage was not air-conditioned. When someone entered or left the garage, Officer White could see vehicles inside. On at least five occasions, Officer White observed Defendant on the premises. Once he saw Defendant present at what seemed like a family gathering in front of the house.

In 1998, Officer Kent Doucey ("Officer Doucey") with the Stone County Sheriff's Department regularly patrolled County Road M. Officer Doucey observed vehicles parked in front of the three-car garage and vehicle parts and debris left outside, which would later disappear. He said that people were working inside the garage with the doors closed. When he drove by the house, the people, if outside, would stop their business and watch him. On one occasion, Officer Doucey saw Defendant and a small woman or a child near the three-car garage. As Officer Doucey drove slowly past the house, they walked toward the road and watched him.

On June 7, 1998, Patsy Carlene Gobetz ("Gobetz") of Springfield, Missouri went to bed and left her window open. At some time during the night, she heard a car engine starting, a door slamming, and a vehicle leaving. She ran to her driveway and found that her 1987 Chevrolet Silverado, which had been parked in her driveway, was missing. Gobetz contacted the police and provided the vehicle identification number and a picture.

On June 10, 1998, the police were called about a trailer blocking traffic on County Road M 140A, just across the bridge from County Road M and two miles from the house. In the middle of the road, they found Gobetz's truck loaded on a trailer. The truck had been completely stripped. The doors were gone, the glove box and dashboard were ripped out, the air horns were gone, the side panels of the cabin were missing, the carpet was taken out, and the floor mats were missing. Inside the truck were two empty white paint cans. The truck had been set on fire, but it had not burned completely. An empty gas can was found in the trailer. It appeared that the trailer had not been moved a long distance because some dry grass clippings were still attached to its ramp. Officer Doucey, who had earlier observed people painting the house white, drove by the house again and noticed that paint cans similar to the ones found in Gobetz's truck were in the green pickup truck that was parked near the house. He also noticed that the yard was recently mowed. It was getting dark, so the police took Gobetz's truck to the sheriff's office where they were able to process it for fingerprints. A fingerprint, which was later matched to Defendant's, was found below the back glass in the truck's interior. The location of the fingerprint was such that a person would have had difficulty reaching that area if the truck was intact.

Alfred Conway ("Conway") owned a farmhouse in Stone County, between Galena and Elsey, Missouri, which he used as a weekend vacation home. On June 8, 1998, his fiancée visited the farmhouse and found everything intact. When she went there the next day, she discovered the laundry room door had been kicked open and furniture was missing. A small kitchen refrigerator was gone, as was an antique spool cabinet from the downstairs bedroom. An antique curio cabinet and some "nodder" dolls were also missing.

Kim Marley and her husband ("The Marleys") lived in Springfield, Missouri, and owned a lawn service business. On June 15, 1998, they parked their 1979 GMC pickup truck and trailer holding their commercial lawnmower, a Dixie chopper, a walk-behind mower, and several

weed eaters in their backyard. The next morning, the equipment and the vehicle were gone. The Marleys were informed four days later that their stolen property was found at Brian's Towing Service. The truck looked burnt, and property not belonging to the Marleys was in the truck, including some burnt hay bales, an owner's manual for a scanner, a spring mattress, beer bottles, a postcard, and an envelope. The envelope was addressed to Defendant at an address a block south of the Marleys' home. The postcard read: "Happy Valentine's Day my love. I love you. Cindy Elkins."

On July 1, 1998, Richard Rieschl, Jr. ("Rieschl") returned to his residence in Branson, Missouri, and discovered that some money, his checkbook, a box of blank checks, and some personal belongings were missing. He reported the theft and closed his bank account. Three days later, on July 4, 1998, two men came into a Brown Derby liquor store in Springfield, Missouri, and purchased two kegs of beer by paying for them with one of Rieschl's checks. The amount paid included a deposit for the beer kegs, which were never returned. Jerry Morris ("Morris"), who was working at the store that day, helped the men carry the kegs to a 1970s model station wagon. When the men opened the vehicle, Morris saw "an astronomical amount" of fireworks. He made a joke asking the men whether they were going to blow up the countryside. The men did not respond.

On July 8, 1998, Gwenda Carnelison ("Carnelison") was having a garage sale at her son's house in Springfield, Missouri. Among the items that Carnelison advertised for sale was an antique cherry bedroom set that she inherited from her grandmother. Two men arrived, and one of them introduced himself as Rieschl and told Carnelison that he was running a ho-

tel or apartment complex and that he wanted to furnish it with antiques. Accompanying this man to help him load the furniture was Defendant. The man who introduced himself as Rieschl wanted to know the history behind the bedroom set. After a thirty to forty-five minute conversation, he offered to write a check for $825, and suggested that Carnelison call the bank to verify that the check was good. The bank, however, was already closed. He then showed a driver's license to verify his identity, but kept the document at a distance from which Carnelison was prevented from reading it. Carnelison assumed that the document would have proved a correct identity and accepted the check with Rieschl's name on it.

On July 8, 1998, one of Rieschl's checks was also used to rent a carpet stretcher for a twenty-four hour period from Fulton Rental in Springfield, Missouri. The check bounced, and the rented item was not returned.

On July 11, 1998, Matthew Hilburn ("Hilburn") put a for sale sign on his teal green 1979 Chevrolet truck and parked it at the Parkcrest Shopping Center in Springfield, Missouri. Two days later, he discovered that the truck was gone. On the ground, he found the screws that held the bed cover on the vehicle and some glass.

On July 12, 1998, Brenda Hayden ("Hayden") had her fiancé park her red 1990 Chevrolet Silverado pickup along Highway 160 in Nixa, Missouri in order to sell it. On July 13, 1998, the truck was gone, and glass was on the ground where it had been.

In the meantime, authorities continued the surveillance of the house. At 11:00 p.m. on July 12, 1998, a deputy with the Christian County Sheriff's Department, Kirk Hammer ("Officer Hammer"), walked behind the outbuildings surrounding the

house, where he concealed himself. He saw Defendant coming from the three-car garage, talking on a hand-held phone. Defendant spoke on the phone for several minutes. At the end of the conversation, Defendant returned to the front of the garage, and in fifteen to twenty minutes, he came back outside accompanied by another man. At 1:50 a.m., both men got into a station wagon and left.

Around 2:50 a.m., a pickup truck passed the house followed by a station wagon. Defendant was driving the station wagon and his companion was not with him. Defendant parked the vehicle near the three-car garage and opened the garage. The pickup that had just passed the house returned and entered the garage. The truck was a 1990s model red Chevrolet with chrome wheels that matched the description of the truck that was stolen from Hayden. Only one person was in the truck. Immediately after the truck entered the garage, the doors went down. Officer Hammer witnessed no further activity.

Officer John Clayton ("Officer Clayton") with the Stone County Sheriff's Department began his surveillance between 9 a.m. and 10 a.m. on the morning of July 13, 1998. He positioned himself about 100 yards from the house. Officer Clayton used binoculars to watch the house and the garage throughout the day. In the afternoon the sound of air tools came from the garage. A blue pickup truck left the house around 1:30 p.m., but from his position, Officer Clayton could not see its license plate. Later, the garage door opened, and Officer Clayton saw Defendant and another individual, Lloyd Stubbs ("Stubbs"), also known as Michael Stubbs, carrying out a teal green truck bed. Both men sat the bed down, walked over, opened another garage door, carried the bed inside, and closed the garage door.

Officer Clayton saw a red Chevrolet pickup parked in another bay of the garage.

Around 4:00 p.m., the authorities served a search warrant at the house. Present in the house were Defendant, Stubbs, Heather Peck, and two other men who were later released. In one of the bedrooms, police found Conway's antique spool cabinet. In the dining room, they found Conway's curio cabinet, and in the small room behind the garage they found his refrigerator. In the front room, authorities found the carpet stretcher rented from Fulton Rental together with rolls of uninstalled carpet, as well as Carnelison's antique furniture. The two beer kegs and a container from Brown Derby were also found on the premises. In the kitchen, the police discovered Rieschl's checkbook. On top of the washer, the police found military velcro I.D. badges and pocket knives taken from Lawrence Burbank's ("Burbank's") residence, which was located near the house on County Road M. Some jewelry and china dishware belonging to Burbank were also found at the house.

In a bedroom, the police found two envelopes in an ice chest. One of the envelopes was sent to Defendant from his mother in 1992. The sender shown on the other envelope, which was mailed in 1996, was Defendant and the recipient was Cindy Elkins ("Elkins"). Two photograph albums containing Defendant's photographs were found nearby. The newer album contained pictures from 1995–96 and included photographs of Elkins.

In the garage, the police found the missing parts of Gobetz's truck including the carpet, the side pockets, the set of air horns, and the floor mats. Hayden's and Hilburn's stolen pickup trucks were also parked in the garage. Hayden's red Chevrolet pickup did not have a radiator in it, but the radiator was found in a side room behind the garage. The chrome wheels

and the tires on Hayden's pickup were replaced with different wheels and tires, the steering column was torn, the mirrors were bent, and the glass on the passenger side window was broken. The interior of Hilburn's pickup was also partially dismantled, the door panels were removed, and a side window was broken. The stereo, the speakers, the door panels, and the back license plate were missing. Numerous tools were found in the garage including hand tools, socket sets and wrenches, crawls, an engine hoist, an air compressor, and airguns. Cans of white paint were stored in the garage. Inside a stall near the garage, police also found the Marley's lawnmower, and in the field, behind the buildings, they located the Marley's trailer.

Defendant was charged with tampering with respect to Gobetz's, Hilburn's, and Hayden's trucks, and with receiving stolen property with respect to Conway's furniture, the Marley's utility trailer and mower, and Hayden's and Hilburn's trucks.

Prior to trial, defense counsel filed a motion in limine to exclude evidence of property that was obtained by means of bank checks stolen from Rieschl. Defense counsel argued that this was evidence of other crimes and was prejudicial. The trial court denied the motion.

Following the State's case at trial, defense counsel moved for a judgment of acquittal, which was denied. Defense counsel then called Robin Owens ("Owens") as a witness. She testified that in June and July 1998, Defendant was living with her in Strafford, Missouri. According to Owens, Barry Lust, Billy Agee, and Stubbs lived in the house. She stated that on July 4, 1998, she and Defendant attended a party at the house and brought some pictures and clothing.

Stubbs testified at trial, and stated that he had left a halfway house in Kansas City, Missouri without permission in May 1998. He testified that he came to the area where he rented the house on County Road M. He stated that he lived there alone. He testified that he knew both of the trucks in the garage were stolen, but that he did not tell Defendant. Stubbs testified that he was charged with possession of stolen property and tampering, and that he pled guilty in accordance with a plea bargain.

In rebuttal to the defense evidence, the State offered the testimony of Duane Laub ("Sergeant Laub"), a sergeant with the Missouri Highway Patrol, who participated in an investigation of the "chop-shop" operation on County Road M and who spoke with Owens and Stubbs. Sergeant Laub testified that Owens only told him that she was a friend of Defendant's sister. In that interview, Owens denied knowing Stubbs. Stubbs told Sergeant Laub that he lived in Springfield, Missouri with a woman named Tina Detwiler, and that he did not know any of the people in the house except Heather Peck. Stubbs told Sergeant Laub that on July 4, 1998, and the rest of the following week, he was camping with a friend.

At the close of all of the evidence, the defense moved for a judgment of acquittal, which was denied. A jury found Defendant guilty on all seven counts. Defendant appeals.

In his first point on appeal, Defendant contends that the trial court erred in overruling his motion for judgment of acquittal and sentencing him on his convictions for receiving stolen property and tampering because "there was no evidence from which a rational trier of fact could have reached a 'subjective state of near certitude' that [Defendant] retained the vehicles and other property, knowing or believing it was stolen, or that he altered a

vehicle knowing that he was doing so without the consent of the owner."

Defendant was charged with receiving stolen property, specifically Hayden's 1990 Chevrolet truck, Hilburn's 1979 Chevrolet truck, the Marley's utility trailer and mower, and Conway's furniture and "nodder" dolls. The crime of receiving stolen property as defined in Section 570.080, RSMo 2000, provides:

A person commits the crime of receiving stolen property if for the purpose of depriving the owner of a lawful interest therein, he receives, retains or disposes of property of another knowing that it has been stolen, or believing that it has been stolen.

■■■ In the present case, Defendant was charged with receiving stolen property by retaining. To support a conviction for receiving stolen property by retaining, the evidence must show that: (1) Defendant retained the property that was stolen; (2) Defendant exercised dominion over the property by retaining it; (3) Defendant knew or believed that the property was stolen; and (4) Defendant intended to deprive the owner of a lawful interest in the property. *State v.. Bird,* 1 S.W.3d 62, 63–64 (Mo.App. E.D.1999).

In the present case, the evidence established that Officer White had seen Defendant at the house on at least five different occasions, including early in the morning and late in the night. Once, he saw Defendant involved in what seemed like a family gathering in front of the house. Officer White's observations led him to believe that Defendant was renting the house. Officer Doucey also testified that while on patrol on County Road M, he had seen Defendant around the house, and that on one occasion he saw Defendant accompanied by a woman or a child. Officer Hammer also testified that late at night on July 12, 1998, he saw

Defendant exiting the garage while talking on a hand-held phone. In the early morning of July 13, 1998, Defendant left the house in the station wagon that was always parked by the house and returned an hour later, parking it in its usual place. Defendant opened one of the doors of the three-car garage in order to allow his companion to park Hayden's truck in the garage. In the afternoon, Officer Clayton heard people working in the garage and saw Defendant carrying the teal green truck bed from one bay of the garage to another. At 4:00 p.m. on July 13, 1998, police executed a search warrant and found Defendant at the premises. In one of the bedrooms, police found personal items belonging to Defendant, including two letters and two photograph albums. The letters were sent in 1992 and in 1996. The albums also contained some recent and some older pictures of Defendant. The newer album contained photographs of Elkins. Earlier, a valentine sent from Elkins to Defendant had been found in the Marley's stolen truck. No one else's personal property was found in the house.

In *State v. Williams,* 635 S.W.2d 55, 57 (Mo.App. W.D.1982), an undercover officer in Higginsville, Missouri was approached by the defendant's accomplice with an offer to purchase typewriters soon after some typewriters with distinctive serial numbers were stolen from the Higginsville High School. The officer was taken to a location in the city where the accomplice picked up the defendant. The defendant and his accomplice took the undercover officer to a trailer where the defendant opened the door, went inside, and led the undercover officer throughout the residence to the bedroom where the typewriters were hidden. From this evidence, the court found that the jury could infer that

the defendant was in a position of control over the stolen property. *Id.* at 58–59.

In the instant case, from Defendant's presence at the house on numerous occasions, at all hours of the day and night, over an extended period of time, coupled with the fact that only Defendant's personal items were found in the house, a reasonable juror could infer that Defendant exercised constructive possession over the stolen property.

■ In addition, possession of stolen property need not be exclusive or apart from all others if there is other evidence to connect a defendant with the offense. *State v. Webb*, 382 S.W.2d 601, 604 (Mo. banc 1964); *State v. Pruett*, 522 S.W.2d 823, 824 (Mo.App. S.D.1975). In the present case, Stubbs claimed that he resided at the house where the stolen property was found, and pled guilty to the charges against him arising out of the same circumstances. Defendant was seen assisting Stubbs with Hayden's truck on July 13, 1998, and helping him remove the bed from Hilburn's vehicle during that day. Thus, the evidence connected Defendant to the stolen property on the premises.

■ Defendant also contends in his point that there was no evidence that he had knowledge of the stolen character of the property. In the argument section of his brief, Defendant, however, discusses the sufficiency of the evidence to support knowledge only in respect to Conway's furniture. Where an appellant's point is not developed in the argument portion of his brief, it is deemed abandoned. *State v. Hamilton*, 996 S.W.2d 758, 761–62 (Mo. App. S.D.1999). Therefore, we will only review Defendant's claim with respect to Conway's furniture.

■ Because direct proof of the knowledge or belief of the stolen character of goods is seldom available, it may be proven by inferences from circumstantial evidence. *State v. Robinson*, 752 S.W.2d 949, 951 (Mo.App. S.D.1988). Defendant's knowledge can be inferred from evidence "[t]hat he was found in possession or control of other property stolen on separate occasions from two or more persons." Section 570.080.2(1). Further, suspicious conduct, deceptive behavior, and other facts and circumstances can be considered in determining whether it would be reasonable for a jury to find that Defendant knew or had reason to believe the property was stolen. *State v. Sutton*, 764 S.W.2d 157, 158 (Mo.App. S.D.1989).

In *State v. Gardner*, 741 S.W.2d 1, 9 (Mo. banc 1987), the unexplained possession of recently stolen property coupled with the evidence of property stolen from twenty-six other owners at different times and locations, and the defendant's statement that he was not going to be "getting out for a long time after this one" was sufficient evidence from which the jury could determine that the defendant knew the property was stolen.

In the instant case, Defendant was found in possession of property stolen from two or more persons on separate occasions. In addition to Conway's furniture, the property included the stolen equipment from the Marleys, Hayden's vehicle, Hilburn's vehicle, and parts of Gobetz's stolen vehicle, as well as, Burbank's valuables and china, Carnelison's antique furniture, and Rieschl's stolen checks. The jury may infer that Defendant knew or believed the property to be stolen from the unexplained possession of recently stolen property.

Here, the unexplained possession of property that was recently stolen coupled with the evidence of other stolen property, and the fact that Defendant and his accomplices worked behind closed doors even in the hottest of weather and were disturbed

by Officer Doucey's patrol of the area and would stop their business and watch him were circumstances from which the jury could infer that Defendant knew that the property at the house was stolen.

■ Defendant further contends that the evidence was insufficient to prove that he knowingly altered Gobetz's, Hayden's, and Hilburn's trucks without the consent of the owners. A person commits the crime of tampering in the first degree when he "knowingly receives, possesses, sells, alters, defaces, destroys or unlawfully operates an automobile, airplane, motorcycle, motorboat or other motor-propelled vehicle without the consent of the owner thereof." Section 569.080.1(2).

In the instant case, the evidence shows that Gobetz's truck was found dismantled and partially burnt at a location approximately two miles from the house. Defendant's fingerprint was recovered from the interior of the vehicle on a location where it would have been difficult to reach if the truck were intact. The ramp of the trailer holding the truck had some dry grass clippings attached, suggesting that it had not been moved a long distance. The grass at the house had recently been mowed. Further, some empty cans of white paint, similar to those found at the house that were recently used to paint the home, were found in Gobetz's truck. The truck was set on fire. From this evidence, the jury could infer that Defendant knowingly altered the vehicle without the owner's consent when he removed the parts and attempted to conceal his actions by hauling the vehicle away from the house and setting it on fire.

Hayden's truck arrived at the house on County Road M in the early morning of July 13, 1998. Defendant was seen leaving the house in a station wagon with another person at 1:50 a.m., and returning an hour later. Defendant was driving the station wagon alone while another person was driving Hayden's truck. It would have taken approximately an hour for a person to drive to Nixa, Missouri, where Hayden's vehicle was stolen, and return to the house. Defendant opened the garage door so that the driver of Hayden's truck could park it inside. The door was then closed immediately before the driver had a chance to turn off the engine. For the remainder of the day, the garage doors were kept closed despite the building not being air-conditioned. In the afternoon, the sound of air tools was heard coming from the garage. At some point, Defendant and Stubbs carried Hilburn's truck bed from one bay of the garage to the other. At that time, Hayden's truck was parked in the garage. At 4:00 p.m., the police executed a search warrant and found that Hayden's truck was missing its radiator. The radiator was discovered in a room behind the garage. From this evidence, the jury could infer that Defendant, acting alone or as an accomplice to Stubbs, altered Hayden's vehicle without her consent between the hours of 2:50 a.m. and 4:00 p.m.

Hilburn's truck was also seen in the garage after its disappearance from the parking lot at the Parkcrest Shopping Center in Springfield, Missouri on July 12th or 13th, 1998. On the afternoon of July 13, 1998, Defendant and Stubbs were seen carrying Hilburn's truck bed from one bay of the garage to another. The garage doors opened and closed immediately allowing Defendant and Stubbs only enough time to carry out the vehicle part and place it in another part of the garage. This evidence was sufficient to support an inference that Defendant knowingly altered or acted as an accomplice to Stubbs in altering Hilburn's truck without his consent.

The State presented sufficient evidence from which a reasonable juror could infer that Defendant was in possession of property that he knew was stolen, and that he altered Gobetz's, Hayden's, and Hilburn's vehicles without their consent. Consequently, Defendant's first point must be denied.

In his second and third points, Defendant contends that the trial court erred in admitting evidence concerning Rieschl's stolen checks. Specifically, Defendant argues in his second point that the trial court erred in admitting evidence concerning the rental and theft of the carpet stretcher that was rented with one of Rieschl's stolen checks because this evidence was irrelevant in that "the carpet stretcher was not connected to [Defendant] in any way, and was not shown to be in his possession at the time the warrant was executed." In his third point, Defendant argues that the trial court erred in admitting Rieschl's checkbook (Exhibit #15) and eleven checks that had been written on Rieschl's checking account (Exhibits #16–25 and Exhibit #28) because "it insinuated to the jury that [Defendant] was involved in a check forging scheme and was thus guilty of the charged offense."

The evidence established that Rieschl's checkbook was stolen from his residence in Branson, Missouri on July 1, 1998. On July 4, 1998, two men driving a station wagon paid for two kegs of beer from the Brown Derby liquor store using one of Rieschl's checks. The check bounced and the beer kegs were not returned. On July 8, 1998, Defendant helped another man load Carnelison's antique furniture after the other man used one of Rieschl's checks to pay for the furniture. Also on July 8, 1998, one of Rieschl's checks was used to rent a carpet stretcher from Fulton Rental. The two empty beer kegs, Carnelison's furniture, and the carpet stretcher were found inside the house during the search by the police on July 13, 1998.

Before trial, Defendant filed a motion in limine to prevent the State from presenting evidence of property acquired with Rieschl's stolen checks claiming it was irrelevant. The State argued that it was seeking to introduce the evidence in order to establish Defendant's knowledge of the stolen character of the items as provided in Section 570.080.2(2). The trial court overruled Defendant's motion.

At trial, Exhibit #15, Rieschl's checkbook, was introduced. The State also introduced testimony from Rieschl who identified Exhibit #16 as one of his stolen checks written to Carpet Barn on July 7, 1998. Next, Rieschl identified Exhibit #17, another stolen check used to rent the carpet stretcher. Rieschl also identified Exhibit #18, a stolen check given to Carnelison for the purchase of her antique furniture; Exhibit #19–25, stolen checks written to various firework companies; and Exhibit #28, a stolen check written to Brown Derby for the beer kegs. Defense counsel did not object to the testimony, but did object to the admission of Exhibits #15–25 and Exhibit #28 on the ground that the evidence was irrelevant. The trial court overruled the objection.

The State also presented the testimony of Gene Johnson ("Johnson"), the owner of Fulton Rental, who testified that a man who went by the name of Rieschl rented a carpet stretcher and paid with a check. Johnson also identified Exhibit #17, the check that he received, and Exhibit #100, the rental contract signed with the name Rieschl. Defense counsel did not object to the testimony, but did object when the State offered Exhibit #100, the rental contract, and #101, a photograph of the carpet stretcher acquired from Fulton Rental. These objections were overruled.

Defendant's contentions that the trial court erred when it admitted evidence of the carpet stretcher and evidence of Rieschl's bounced checks have not been preserved for appeal. Defendant did not object when the evidence was first adduced. *See State v. Kalagian,* 833 S.W.2d 431, 433 (Mo.App. E.D.1992); *State v. Delgado,* 774 S.W.2d 549, 551 (Mo.App. S.D. 1989). Defense counsel did not object when the witnesses announced which stolen checks were used and where, and did not object to the testimony that a carpet stretcher was rented with one of the checks and not returned.

■ While Defendant did make an interlocutory motion in limine, the motion preserved nothing for appeal. *See State v. Purlee,* 839 S.W.2d 584, 592 (Mo. banc 1992) (The court held that a ruling in limine is interlocutory only and is subject to change during the course of the trial. The motion in limine, in and of itself, preserves nothing for appeal.). The trial court must be given the opportunity to reconsider its ruling during the trial in light of the evidence that has been adduced in order to preserve a claim for appeal. *State v. Sandusky,* 761 S.W.2d 710, 713 (Mo.App. E.D.1988).

■ This Court, however, may grant Defendant plain error review under Rule 30.20.[3] To be entitled to relief under the plain error rule, Defendant must go beyond a mere showing of demonstrable prejudice to show manifest prejudice affecting substantial rights. *State v. Parker,* 856 S.W.2d 331, 332 (Mo. banc 1993). Defendant must demonstrate that manifest injustice or a miscarriage of justice will occur if the error is not corrected. *State v. Worthington,* 8 S.W.3d 83, 87 (Mo. banc

1999), *cert. denied* 529 U.S. 1116, 120 S.Ct. 1978, 146 L.Ed.2d 807 (2000); *State v. Burgess,* 28 S.W.3d 441, 443 (Mo.App. S.D. 2000).

■ Evidence of prior uncharged crimes is inadmissible to prove that a defendant has a propensity to commit a similar crime. *State v. Gilyard,* 979 S.W.2d 138, 140 (Mo. banc 1998). Evidence of uncharged crimes is generally admissible, however, for other purposes if it is logically relevant, in that "it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial," and legally relevant, in that "its probative value outweighs its prejudicial effect." *State v. Burns,* 978 S.W.2d 759, 761 (Mo. banc 1998). Evidence of uncharged crimes is admissible to show motive, intent, the absence of mistake or accident, a common scheme or plan in the commission of two or more crimes, the identity of the person charged with the commission of the crime, or the defendant's signature modus operandi. *See Gilyard,* 979 S.W.2d at 140–41. An additional exception is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of the events surrounding the offense charged. *State v. Morrow,* 968 S.W.2d 100, 107 (Mo. banc 1998). This evidence is admissible to present a complete and coherent picture of the events that transpired. *Id.*

As discussed in Point One, Section 570.080.2(2) allows for the admission of evidence that Defendant was found in possession or control of property stolen on separate occasions from two or more persons. In light of Defendant's strategy of denying any knowledge that the property in the house was stolen, the State was entitled to rely on the statutory provision

---

**3.** All rule references are to Missouri Rules of Civil Procedure (2001), unless otherwise indicated.

to prove the requisite knowledge and establish through circumstantial evidence this element of the crime.

Additionally, the State was entitled to present the complete and coherent picture of the crime by offering evidence of uncharged crimes that are so linked together in point of time and circumstances with a crime charged that one cannot fully be shown without proving the other. *State v. Reilly*, 674 S.W.2d 530, 534 (Mo. banc 1984); *State v. Esposito*, 899 S.W.2d 904, 906 (Mo.App. S.D.1995). Under this exception, the State is not required to sift and separate the evidence tending to prove the crime for which the accused is not on trial. *State v. Johnson*, 753 S.W.2d 576, 581 (Mo.App. S.D.1988).

In the instant case, Rieschl's checks were stolen and used by two men. Carnelison identified Defendant as one of the individuals involved in the purchase of her antique furniture with the stolen check. The two beer kegs and the carpet stretcher were also obtained with the use of stolen checks and were found at the house. The remaining bounced checks introduced by the State were used to purchase fireworks. Morris testified that the two men who purchased the beer were driving a station wagon filled with an "astronomical amount" of fireworks. Police found Rieschl's checkbook in the house. The State was entitled to present to the jury the complete picture of Defendant's criminal activities during June and July 1998.

Further, the evidence regarding the stolen carpet stretcher and Rieschl's other stolen checks was admissible because it tended to show the identity of the persons who were involved in the crimes charged. In *State v. Robinson*, 684 S.W.2d 529, 530 (Mo.App. E.D.1984), the defendant was charged with a burglary of a grocery store in Center, Missouri. The trial court admitted evidence that following the burglary, the defendant committed another burglary for which he was not on trial, but for which he was arrested and some of the stolen property from the first burglary was found in his van at the time of his arrest. *Id.* at 531. The court held that this evidence was relevant to establish the defendant's identity and to present the complete and coherent picture of the crime. *Id.* Likewise, in the present case, the evidence was admissible to show that Defendant and his accomplice stole Rieschl's checks and used them to obtain the beer kegs and carpet stretcher, which were later found at the house together with the rest of the stolen property, and connected Defendant with the stolen property on the premises.

The evidence regarding the stolen checks used by Defendant and his accomplice to obtain property, some of which was still present in the house when the search warrant was executed, was relevant and admissible to present to the jury the complete and coherent picture of the events surrounding the crimes and to establish the identity of the persons involved in the charged crimes. Defendant has not demonstrated that he suffered manifest injustice from the admission of this evidence. Defendant's second and third points are therefore denied.

The judgment of the trial court is affirmed.

PREWITT, J., and RAHMEYER, J., concur.